IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 6, 2018 Session

## ELIZABETH E. IVEY GOODRICH v. JOHN EXERA GOODRICH, JR.

**Appeal from the Circuit Court for Montgomery County
No. MCCCCVDV112297  Jill Bartee Ayers, Judge**

_____

### No. M2017-00792-COA-R3-CV

_____

As part of a divorce proceeding, the trial court ordered a father to pay child support. Within two months thereafter, the father lost his job as a finance manager for an automotive dealership. The father filed a motion to modify his child support obligation and took a job in another field, making significantly less money. The father claimed that a more lucrative job was not available to him because he only had a high school education. And he did not wish to pursue another job as an automotive dealership finance manager due to the long hours, pressure, and deleterious effect of the job on his health. The mother opposed the motion to modify, claiming that the father was voluntarily underemployed. The trial court agreed. On appeal, the father challenges only the court's determination that he was voluntarily underemployed. After a review of the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which RICHARD H. DINKINS and KENNY W. ARMSTRONG, JJ., joined.

B. Lynn Morton and Nick T. Tooley, Clarksville, Tennessee, for the appellant, John Exera Goodrich, Jr.

Stacy A. Turner, Clarksville, Tennessee, for the appellee, Elizabeth E. Ivey Goodrich.

# OPINION

## I.

In the waning days of 2011, the Circuit Court for Montgomery County, Tennessee, awarded Elizabeth Goodrich ("Mother") and John Goodrich ("Father") a divorce. At the time of the divorce, the parties had four children who were still minors. The court approved an agreed permanent parenting plan that named Mother the children's primary residential parent and ordered Father to pay child support. The court calculated child support based upon Father earning a gross monthly income of $10,000.

On March 2, 2012, Father filed a motion to modify his child support obligation. Father alleged that "his income was drastically reduced in February, 2012 due to loss of employment," which "was not anticipated at the time of the parties' divorce." The motion also alleged that Father was "trying to obtain new employment."

The motion to modify child support did not come on for hearing until June 10, 2016. The reason for this delay is a matter of dispute. According to Father, he and Mother agreed that resolving the issue of child support could wait until the parties sold the marital residence. But the sale took longer than anticipated. On appeal, Mother asserted that Father simply failed to set his motion for a hearing. Undisputedly, after losing his job, Father unilaterally stopped paying the court-ordered amount of child support. When Father resumed paying child support, he paid less than one-half of the court-ordered amount.

Only Father and Mother testified at the hearing. Their testimony established that Father worked in the automotive sales industry for over 20 years, starting at age 20 or 21. He began his career by selling cars, eventually working his way up to finance manager. Father held that position at various dealerships for 16 or 17 years. When the parties divorced, he was earning $10,000 per month working for a large, local dealership.

On February 13, 2012, the dealership terminated Father, who was then 43 years old. Records supplied by the dealership included a handwritten note that the termination was for "poor job performance." When asked about this, Father could not elaborate further but suggested that the stated rationale was only a pretext. Father described automotive sales as "a political business." And he explained that, if "they don't want you around, . . . they find a way to get rid of you."

After losing his job, Father claimed to have "searched very diligently for jobs in similar industries." He testified that he sent out "a lot" of resumes but could not recall how many. According to Father, he "posted resumes and stuff" on "work websites."

2

When asked by his counsel if he had "any bites at all," Father stated that he had "a couple" but that his lack of a post-secondary education proved to be an obstacle.

When asked on cross-examination about efforts to obtain a job with another automotive dealership, Father conceded that his efforts were "limited." According to Father, such jobs were for the young, someone willing to work eighty or ninety hours a week. Father claimed that his health would no longer allow him to work those hours and that the job placed too much stress on him.

Within "a few months" of his termination, Father went to work for Goodrich Construction, a business owned by his father and mother. He started as an independent contractor making $600 per week. At the time of the hearing, he still worked for the business, but as an employee, making the same $600 per week. Father's only prior experience in construction was working for his father as a kid.

Father claimed that, while his current employment paid significantly less than his prior job, it provided regular income and much less stress. Mother acknowledged that Father's position as finance manager was stressful and required him to work long hours. Mother also stated that Father's personality and demeanor were more pleasant since leaving the dealership.

Based upon this testimony, the trial court found that Father was voluntarily underemployed. The court considered it "problematic" that Father did not seek other "employment in a field [in] which he had worked the majority of his adult life." The court also questioned Father's diligence in seeking other employment, noting that Father testified to having no job interviews. And Father offered no medical proof to support his testimony that, for health reasons, he could not resume work as a finance manager.

Later, in denying Father's motion to alter or amend, the court "found it suspect that Father began working in a family business shortly after he was terminated." The fact that Father had not received any raises in his years of working construction was also suspect, causing the court to question whether Father was receiving some undisclosed support from his family.

The court awarded Mother a judgment for Father's child support arrearages. For purposes of calculating child support and in light of its finding of voluntary underemployment, the court imputed income to Father, finding that he had the capacity to earn $10,000 per month.

## II.

Father raises two issues on appeal, but both issues relate to the court's finding of voluntary underemployment. Under the Tennessee Child Support Guidelines, a court

may set child support based on a parent's income potential or earning capacity if the court finds that a parent is willfully or voluntarily underemployed. TENN. COMP. R. & REGS. 1240-02-04-.04(3)(a)(2) (2008). This authority keeps parents from "avoid[ing] their financial responsibility to their children by unreasonably failing to exercise their earning capacity." *Massey v. Casals*, 315 S.W.3d 788, 795 (Tenn. Ct. App. 2009). The parent receiving child support bears the burden of proving that the obligor parent is willfully or voluntarily underemployed. *Demers v. Demers*, 149 S.W.3d 61, 69 (Tenn. Ct. App. 2003).

The determination of whether a parent is willfully and/or voluntarily under or unemployed presents a question of fact. *See Eldridge v. Eldridge*, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002). In non-jury cases, findings of fact are presumed to be correct unless the evidence in the record preponderates against them. Tenn. R. App. P. 13(d). Thus, we "accord[] substantial deference to the trial court's decision, especially when it is premised on the trial court's singular ability to ascertain the credibility of the witnesses." *Richardson v. Spanos*, 189 S.W.3d 720, 726 (Tenn. Ct. App. 2005) (citation omitted). Evidence preponderates against a finding of fact only if the evidence "support[s] another finding of fact with greater convincing effect." *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005). We will not overturn a trial court's assessment of credibility on appeal absent clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

The Guidelines do not presume that a parent is willfully underemployed. TENN. COMP. R. & REGS. 1240-02-04-.04(3)(a)(2)(ii). The trial court must "ascertain the reasons for the parent's occupational choices, and . . . assess the reasonableness of these choices in light of the parent's obligation to support his or her child(ren) and . . . determine whether such choices benefit the children." *Id*. So the "complete factual background of the obligor's situation" is relevant. *Ralston v. Ralston*, No. 01A01-9804-CV-00222, 1999 WL 562719, at *5 (Tenn. Ct. App. Aug. 3, 1999).

The Guidelines include a list of nonexclusive factors that may be considered in making a determination of willful and/or voluntary underemployment or unemployment. Pertinent to this appeal, the fact finder may consider "[t]he parent's past and present employment" and "[t]he parent's education, training, and ability to work." TENN. COMP. R. & REGS. 1240-02-04-.04(3)(a)(2)(iii)(I), (II).

Courts often begin their analysis with the circumstances under which the parent left his previous employment. *Eldridge*, 137 S.W.3d at 21. "When a party with child support obligations voluntarily leaves their employment and chooses to accept a job which provides significantly less income, courts are more inclined to find willful and voluntary underemployment." *Id*.; *see, e.g.*, *DeWerff v. DeWerff*, No. M2004-01283-COA-R3-CV, 2005 WL 2104736, at *4 (Tenn. Ct. App. Aug. 31, 2005) (affirming finding that the father was voluntarily underemployed when he "voluntarily chose to

4

abandon a successful legal practice in order to relocate to another state for purely personal reasons"); *Willis v. Willis*, 62 S.W.3d 735, 738-39 (Tenn. Ct. App. 2001) (affirming determination that the father was voluntarily underemployed when he changed jobs because he was dissatisfied); *Watters v. Watters*, 22 S.W.3d 817, 823 (Tenn. Ct. App. 1999) (affirming finding of voluntary unemployment when the father quit his job rather than accept a lateral transfer).

Next, the court scrutinizes the parent's subsequent course of conduct. *Eldridge*, 137 S.W.3d at 21. This scrutiny includes an examination of whether the parent made a good faith effort to replace their lost income. *Id*.; *see, e.g.*, *Sitz v. Sitz*, No. E2012-01726-COA-R3-CV, 2013 WL 5450416, at *10 (Tenn. Ct. App. Sept. 30, 2013) (affirming finding of voluntary underemployment when the husband worked only sporadically at jobs that did not use his education, skills, or experience and only submitted seven written job applications in two years); *Kaplan v. Bugalla*, No. M2006-02413-COA-R3-CV, 2007 WL 4117787, at *5 (Tenn. Ct. App. Nov. 16, 2007) (noting that the father limited his job search to online inquiries and failed to make any additional efforts to find new employment); *Demers*, 149 S.W.3d at 72 (affirming finding of voluntary underemployment in part because the father failed to take affirmative steps to find regular employment commensurate with his skills).

Here, the trial court found that Father did not voluntarily leave his position as a finance manager. The record suggests at least two possible reasons for his termination. The court found that the termination was due to poor job performance brought on by stress. Father offered that he was terminated for "political" reasons or possibly a desire on the part of the dealership to hire someone younger. In either circumstance, Father had no control over his departure from his previous position.

On appeal, Father makes much of the fact that he did not leave his previous job voluntarily. But involuntary loss of a job does not preclude a finding of willful or voluntary underemployment. *State ex rel. Ledbetter v. Godsey*, No. M1998-00958-COA-R3-CV, 2000 WL 798641, at *5 (Tenn. Ct. App. June 22, 2000). A parent's "course of action and decision-making after termination can demonstrate willful and voluntary underemployment." *Id*. That was true in this case.

The court determined that Father "did not make reasonable efforts to obtain employment in a field [in] which he had worked the majority of his adult life." The court also found that he did not "make efforts to seek employment in a field with comparable income." Father asserts that it was neither realistic nor reasonable to expect "a middle-aged man with only a high school diploma[] to obtain employment with the same or greater salary in a similar position."

We disagree with Father's assertion. When he was terminated, Father was in his early 40s and had at least 16 years of experience as a finance manager. And although he

had spent the majority of his career with one dealership group, Father had worked for other dealerships, and he had worked in automobile sales as well as in the finance area. Also of significance, Father could not recall how many resumes he had sent out, only remembering that he had posted resumes on websites. And Father testified that he only spoke on the phone with "some banks" but he never had an interview.

Father also argues that his "occupational choice to not return to the same or similar job was reasonable in light of the long hours, demands of the job and tremendous stress." The court deemed it suspicious that Father went to work at his parents' family business so soon after his termination and that he stayed there despite never receiving a raise in wages. These facts along with Father's description of his post-termination job search support a finding that Father did not make reasonable choices in light of his obligation to pay child support. *See* TENN. COMP. R. & REGS. 1240-02-04-.04(3)(a)(2)(ii). Further, we infer that the trial court did not credit Father's testimony that his health justified a limited job search. *See Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733-34 (Tenn. 2002) ("[F]indings with respect to credibility and the weight of the evidence . . . may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case.").

Although Father claims there was no proof that he "acted in bad faith or had deliberately manipulated his income downward," that level of proof is not required. *See* TENN. COMP. R. & REGS. 1240-02-04-.04(3)(a)(2)(ii)(I) ("A determination of willful and/or voluntary underemployment or unemployment is not limited to choices motivated by an intent to avoid or reduce the payment of child support."). The court may base its determination "on any intentional choice or act that adversely affects a parent's income." *Id.*; *see Anderson v. Anderson*, No. 01A01-9704-CH-00186, 1998 WL 44947, at *4-5 (Tenn. Ct. App. Feb. 6, 1998) (rejecting argument that the wife had to prove that employment decision was made with the specific intent to escape child support obligation).

## III.

The evidence does not preponderate against the trial court's factual finding that Father was voluntarily underemployed. So we affirm.

_____
W. NEAL MCBRAYER, JUDGE

6